UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN ALLEN LIGHTFOOT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 13-11264-JGD |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION AND ORDER
## ON CROSS-MOTIONS REGARDING DENIAL OF
## <u>SUPPLEMENTAL SECURITY INCOME BENEFITS</u>

September 30, 2014

DEIN, U.S.M.J.

## I.  <u>INTRODUCTION</u>

The plaintiff, John Allen Lightfoot ("Lightfoot"), has brought this action pursuant

to sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), in order to challenge the final decision of the Commissioner of the Social

Security Administration ("Commissioner") denying his claim for Supplemental Security

Income ("SSI") benefits.  The matter is presently before the court on the "Plaintiff's

Motion for Order Reversing the Commissioner's Decision and Awarding Benefits"

(Docket No. 21), by which the plaintiff is seeking an order reversing the Commissioner's

decision and directing the payment of benefits, or in the alternative, remanding the matter

to the Social Security Administration for further administrative proceedings before a

newly selected Administrative Law Judge ("ALJ").  It is also before the court on the "Defendant's Motion to Affirm the Commissioner's Decision" (Docket No. 29), by which the Commissioner is seeking an order upholding her decision to deny Lightfoot's claim. At issue is whether the ALJ, in reaching her decision that Lightfoot was not disabled, erred by rejecting the plaintiff's claim that he meets the listing for mental retardation, and by failing to consider whether the plaintiff meets or medically equals the listing for organic mental disorders, under 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1") of the Social Security regulations.[1]  Also at issue is whether the ALJ committed reversible error by wrongfully rejecting and substituting her own views for the opinions of Lightfoot's primary care physician, Gustavo Velasquez, M.D., and by failing to conduct a proper assessment of the plaintiff's credibility.  For all the reasons described below, this court concludes that the ALJ's justification for finding that Lightfoot did not satisfy the criteria of the listing for mental retardation, and her reasons for rejecting Dr. Velasquez's opinion regarding the limiting effects of Lightfoot's mental limitations, were not based on substantial evidence, and that the matter must be remanded for further consideration of these issues.  Accordingly, the defendant's motion to affirm the Commissioner's decision is DENIED, and the plaintiff's motion to reverse is ALLOWED

---

[1] As both parties recognize, in 2013, the Social Security Administration replaced the term "mental retardation" with "intellectual disability" in its Listing of Impairments.  See "Change in Terminology: 'Mental Retardation' to 'Intellectual Disability,'" 78 Fed. Reg. 46499-46501, 2013 WL 3936340 (Aug. 1, 2013).  Because the ALJ's decision predates the amendment, and the parties have used the original language in their briefs, this court will likewise use the term "mental retardation" rather than "intellectual disability."

to the extent that it requests a remand to the Social Security Administration for further proceedings consistent with this decision. However, the plaintiff's request for a ruling that the matter be heard by a new ALJ upon remand is denied.

## II. <u>STATEMENT OF FACTS</u>[2]

Lightfoot was born on October 1, 1960, and was 51 years old at the time of his hearing before the ALJ. (Tr. 64, 166). He has an eleventh grade education, and has never completed any specialized job training, trade school or vocational school. (Tr. 201). In 1975, when he was 15 years old, Lightfoot was shot in the front of his head and underwent multiple procedures at Children's Hospital in Boston, including resection of the tip of his frontal lobe. (Tr. 204, 254, 583-84). Although he was able to recover from the shooting incident, Lightfoot claims that it caused him to suffer serious difficulties in school, and to leave school in the eleventh grade after failing all of his subjects. (Tr. 364-65, 583). He also claims that the incident adversely impacted his ability to engage in sports, and that he has never recovered the motivation, energy or strength that he had prior to the date of his injury. (Tr. 583).

The record shows that Lightfoot has not held any significant job since leaving high school. (Tr. 365, 583). Although the plaintiff did attempt to work in various capacities, including as a painter, construction worker and janitor, he claims that he was fired from every position that he ever held. (<u>Id.</u>). According to Lightfoot, he has managed to subsist

_____

[2] References to pages in the transcript of the record proceedings shall be cited as "Tr.__." The ALJ's decision shall be cited as "Dec." and can be found beginning at Tr. 42.

on welfare benefits, food stamps, and assistance from his mother and common law wife, throughout his entire adult life. (See id.). He further contends that he has been completely disabled and incapable of working since March 2010, as a result of both his physical and mental impairments. (Tr. 62-63).

## **Procedural History**

Lightfoot filed an application for SSI benefits on March 4, 2010, claiming that he had been unable to work since July 16, 2009.[3] (Tr. 166-73). He subsequently amended the alleged onset date of his disability to his application date of March 4, 2010. (Tr. 183). The plaintiff's application was denied initially in July 2010. (Tr. 102, 104-06). It was denied again upon reconsideration in October 2010. (Tr. 103, 110-12).

Thereafter, Lightfoot requested and was granted a hearing before an ALJ, which was scheduled to take place on October 19, 2011 in Boston, Massachusetts. (Tr. 113-15, 131-36). Prior to the hearing, Lightfoot's student attorney from the WilmerHale Legal Services Center of Harvard Law School submitted a Hearing Memorandum on the plaintiff's behalf, arguing therein, as at the hearing and before this court, that Lightfoot was presumptively disabled under the Social Security regulations because he satisfied the criteria of Listing 12.02 of Appendix 1 for organic mental disorders, as well as the criteria of Listing 12.05 for mental retardation. (Tr. 157-62). Alternatively, counsel has consistently asserted that the combination of Lightfoot's residual functional capacity

---

[3] While Lightfoot raised a number of medical conditions in support of his application, this court will limit its discussion to those at issue in his appeal.

("RFC"), age, limited education and lack of prior work experience, rendered him disabled and entitled to benefits because he was incapable of performing any type of substantial gainful activity.  (See Tr. 162-64).

The hearing took place before the ALJ, Constance D. Carter, on the morning of October 19, 2011, as scheduled.  (Tr. 58-92).  During the hearing, Lightfoot testified regarding such matters as the nature of his impairments, his activities of daily living, and the severity and limiting effects of his symptoms.  (Tr. 64-83).  The ALJ also elicited testimony from a vocational expert ("VE"), who responded to hypothetical questions designed to determine whether jobs exist in the regional or national economies for an individual with the same age, educational background, past work experience, and RFC as the plaintiff.  (Tr. 85-89).

On October 27, 2011, the ALJ issued a decision denying Lightfoot's application for benefits.  (Tr. 39-52).  The plaintiff then filed a request for review by the Social Security Appeals Council, and on April 25, 2013, the Appeals Council denied the request, thereby making the ALJ's decision the final decision of the Commissioner for purposes of review.  (Tr. 1-3, 37).  Accordingly, Lightfoot has exhausted his administrative remedies, and the case is ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

### The ALJ's Decision

The ALJ concluded that from March 4, 2010 through the date of her decision on October 27, 2011, Lightfoot had not been "under a disability, as defined in the Social Security Act," which defines "disability" as "the inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." (Dec. 1 and Finding #10; Tr. 42, 52). See also 42 U.S.C. § 1382c(a)(3)(A). There is no dispute that the ALJ, in reaching her decision, applied the five-step sequential evaluation required by 20 C.F.R. § 416.920. The procedure resulted in the following analysis, which is detailed in the ALJ's "Findings of Fact and Conclusions of Law." (See Dec. 3-11; Tr. 44-52).

The first inquiry in the five-step process is whether the claimant is "engaged in substantial gainful work activity[.]" Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). If so, the claimant is automatically considered not disabled and the application for benefits is denied. See id. In the instant case, the ALJ determined that Lightfoot had not engaged in substantial gainful work activity since March 4, 2010, the alleged onset date of his disability. (Dec. Finding #1; Tr. 44). Therefore, the ALJ proceeded to the next step in the sequential analysis.

The second inquiry is whether the claimant has a "severe impairment," meaning an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 416.920(c). If not, the claimant is considered not disabled and the application for benefits is denied. See Seavey, 276 F.3d at 5. Here, the ALJ concluded that Lightfoot suffered from several severe impairments, including osteoarthritis, asthma, mild mental retardation, and obesity. (Dec. Finding #2; Tr. 44). Accordingly, her analysis continued.

The third inquiry is whether the claimant has an impairment equivalent to any of the specifically listed impairments in Appendix 1 of the Social Security regulations, in which case the claimant would automatically be found disabled. See Seavey, 276 F.3d at 5; 20 C.F.R. § 416.920(d). At this step, the ALJ rejected Lightfoot's contention that he satisfied Listing 12.05 and/or Listing 12.02, ruling that there was "nothing in the medical evidence of record establishing that any of the claimant's impairments is of listing level severity." (Dec. 4; Tr. 45). Therefore, she concluded that Lightfoot's impairments, either alone or in combination, did not meet or medically equal any of the listed impairments. (Dec. Finding #3; Tr. 45). As detailed below, while this court concludes that the ALJ's findings with respect to Listing 12.02 are supported by the record, her rejection of an IQ test result for Lightfoot and her failure to assess whether Lightfoot showed deficits in adaptive functioning require that this matter be remanded for further consideration of whether he meets Listing 12.05.

Because the ALJ determined that Lightfoot's impairments did not meet or medically equal any of the listed impairments, her analysis continued. The fourth inquiry asks whether "the applicant's 'residual functional capacity' is such that he or she can still perform past relevant work[.]" Seavey, 276 F.3d at 5. In the instant case, the ALJ determined as follows with respect to Lightfoot's RFC:

> After careful consideration of the entire record, I find that the
> claimant has the residual functional capacity to perform light work

as defined in 20 CFR 416.967(b)[4] except the claimant can push and/or pull occasionally with his upper or lower extremities, he can never climb ladders, ropes or scaffolds, he can occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl, he needs to avoid concentrated exposure to extreme heat or cold, noise, irritants, such as fumes, odors, dust, gases or poorly ventilated areas, unprotected heights and hazardous machinery, he can occasionally grasp with his left hand and he can perform simple, routine tasks with occasional decision-making and occasional changes in the work setting.

(Dec. Finding #4; Tr. 46).

As detailed below, Lightfoot objects to the ALJ's decision to reject the opinion of his treating physician, Gustavo Velasquez, M.D., that Lightfoot's physical and mental impairments were more limiting, and her decision not to credit all of Lightfoot's testimony as to the extent of his symptoms. For the reasons explained below, this court concludes that the ALJ's assessment of Lightfoot's physical impairments are supported by the record. However, her assessment of his mental impairments must be reconsidered on remand.

After reviewing Lightfoot's testimony, the medical evidence of record, and the available opinion evidence, the ALJ concluded that her assessment of Lightfoot's RFC

---

[4] 20 C.F.R. § 416.967(b) defines "light work" as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."

was "supported by the medical evidence of record as a whole." (See Dec. 10; Tr. 51).
She then determined that Lightfoot had no past relevant work, so there was no need to
consider, at step four, whether he retained the RFC to perform such work. (See Dec.
Finding #5; Tr. 51). Consequently, the ALJ reached the fifth and last step in the
sequential analysis.

The fifth inquiry is whether, given the claimant's RFC, education, work experi-
ence and age, the claimant is capable of performing other work. See Seavey, 276 F.3d at
5; 20 C.F.R. § 416.920(g). If so, the claimant is not disabled. 20 C.F.R. § 416.920(g).
At step five, the Commissioner has the burden "of coming forward with evidence of
specific jobs in the national economy that the applicant can still perform." Seavey, 276
F.3d at 5. In the instant case, the ALJ relied on the testimony of the VE to conclude that
Lightfoot was capable of performing work that exists in significant numbers in the
national economy. (Dec. 11; Tr. 52). Therefore, the ALJ found that Lightfoot was not
disabled. (Id.).

Additional factual details relevant to this court's analysis are described below
where appropriate.

### III.  ANALYSIS

#### A.    Standard of Review

Lightfoot is seeking judicial review of the Commissioner's "final decision"
pursuant to the Social Security Act § 205(g), 42 U.S.C. § 405(g) (the "Act"). The Act
provides in relevant part that:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action .... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a re-hearing. The findings of the Commissioner of Social Security as to any fact, if supported by *substantial evidence*, shall be conclusive ....

42 U.S.C. § 405(g) (emphasis added). The Supreme Court has defined "substantial evidence" to mean "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); accord Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).

It has been explained that:

> In reviewing the record for substantial evidence, we are to keep in mind that "issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [Commissioner]." The [Commissioner] may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the [Commissioner's] findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). Thus,

"the court's function is a narrow one limited to determining whether there is substantial evidence to support the [Commissioner's] findings and whether the decision conformed to statutory requirements." Geoffroy v. Sec'y of Health & Human Servs., 663 F.2d 315, 319 (1st Cir. 1981). The Commissioner's decision must be affirmed, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).

"Even in the presence of substantial evidence, however, the Court may review conclusions of law, and invalidate findings of fact that are 'derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts[.]'" Musto v. Halter, 135 F. Supp. 2d 220, 225 (D. Mass. 2001) (quoting Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam)) (internal citations omitted). "Thus, if the ALJ made a legal or factual error, the court may reverse or remand such decision to consider new, material evidence or to apply the correct legal standard." Ross v. Astrue, Civil Action No. 09-11392-DJC, 2011 WL 2110217, at *2 (D. Mass. May 26, 2011) (internal citation omitted).

## B.   Presence of Listing 12.05(C) - Mental Retardation

The plaintiff's principal argument on appeal is that the Commissioner's decision to deny his claim for SSI benefits must be reversed because the ALJ erred in failing to find that his impairments met the criteria set forth in subparagraph C of Listing 12.05 for mental retardation. (Pl. Mem. (Docket No. 22) at 6-8). At step three of the disability analysis "it is the claimant's burden to show that he has an impairment or impairments

-11-

which meets or equals a listed impairment in Appendix 1" of the Social Security regulations. Torres v. Sec'y of Health & Human Servs., 870 F.2d 742, 745 (1st Cir. 1989). "An impairment meets the listings only when it manifests the specific findings described in the set of medical criteria for a particular listed impairment." Martinez Nater v. Sec'y of Health & Human Servs., 933 F.2d 76, 77 (1st Cir. 1991) (internal quotations omitted). "An impairment equals a listed impairment when the set of symptoms, signs and laboratory findings in the medical evidence supporting the claimant are at least equivalent in severity to the set of medical findings for the listed impairment." Id. (quotations and citation omitted). In the instant case, Lightfoot has shown that his impairments meet the severity requirements of Listing 12.05(C). However, this court finds that the matter must be remanded so that the ALJ can consider whether he meets the criteria contained in the Listing's introductory paragraph.

## Requirements of Listing 12.05

"Section 12.05 of the listings defines mental retardation as 'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., . . . before age 22." Santos v. Astrue, Civil Action No. 10-40166-TSH, 2012 WL 1109285, at *6 (D. Mass. Mar. 30, 2012) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05) (punctuation in original). In order to meet Listing 12.05, the claimant must satisfy "both the diagnostic description in the introductory paragraph and the criteria of a subparagraph." Libby v. Astrue, 473 Fed. Appx. 8, 9 (1st Cir. 2012). In the instant case, Lightfoot claims that he meets the

requirements of subparagraph C.  Under § 12.05(C), the claimant must demonstrate "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function[.]"  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).  Accordingly, "subsection C of the mental retardation listing requires proof of three elements: (1) Deficits in adaptive functioning initially manifested before age 22; (2) A valid verbal, performance, or full scale IQ of 60 through 70; and (3) A physical or other mental impairment imposing an additional and significant work-related limitation of function."  Richardson v. Soc. Sec. Admin. Comm'r, No. 1:10-cv-00313-JAW, 2011 WL 3273140, at *6 (D. Me. July 29, 2011).

### Lightfoot's Challenge to the ALJ's Analysis

The ALJ found that the plaintiff did not satisfy the requirements of Listing 12.05(C) because he "does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  (Dec. 4; Tr. 45).  The plaintiff contends that the ALJ's findings on these matters were erroneous, and that the error supports a reversal and order for the payment of benefits.  (See Pl. Mem. at 6-8).  This court agrees that the ALJ's decision with regard to the IQ requirement and the work-related limitation of function requirement lack substantial support in the evidence.  However, the matter must be remanded so that the ALJ can consider whether Lightfoot has met the "deficits in adaptive functioning" element of Listing 12.05.

## IQ Score

In concluding that Lightfoot did not have an IQ between 60 and 70, the ALJ relied on a psychological evaluation that was conducted by Susan Mascoop, Ed.D. on June 29, 2011. (Dec. 4; Tr. 45 (citing Tr. 582-88)). Using the fourth edition of the Wechsler Adult Intelligence Scale ("WAIS"), Dr. Mascoop found that Lightfoot had a full scale IQ score of 71. (Tr. 585). The ALJ credited Dr. Mascoop's results, but rejected an earlier IQ test that was conducted by Scott Haas, Ph.D., a consultant from the University of Massachusetts Medical School Disability Evaluation Services. (See Dec. 8; Tr. 49 (citing Tr. 476-82)). Using the third edition of the WAIS test on July 21, 2009, Dr. Haas determined that Lightfoot had a full scale IQ of 66. (Tr. 481). His testing further revealed that Lightfoot had a verbal IQ score of 73 and a performance IQ score of 63. (Id.). Lightfoot's full scale and performance IQ scores were in "the mild range of mental retardation." (Id.). In addition, both of these scores meet the IQ prong of Listing 12.05(C). See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C). Consequently, Dr. Haas completed an SSI Listings form in which he indicated that Lightfoot met the criteria of Listing 12.05 for mental retardation. (Tr. 476-77).

In accepting Dr. Mascoop's score and rejecting Dr. Haas' score, the ALJ ruled as follows:

> I do not accord much weight to Dr. Haas' intelligence test results in Exhibit 25F. Instead, I accord more weight to Dr. Mascoop's test results in Exhibit 29F. Dr. Mascoop pointed out that she administered the Wechsler Adult Intelligence Scale-IV to the claimant, whereas Dr. Haas previously administered the third edition

of this test to the claimant.  She noted that the fourth edition has four index scores and a full scale IQ score and because the index scores are based on smaller groups of subtests, the scores more accurately reflect an individual's cognitive ability.  (Exhibit 29F).

(Dec. 8; Tr. 49).  This analysis is not supported by substantial evidence.

"Although there is no definite rule on the issue of how to reconcile multiple IQ results, courts tend to prefer the lowest IQ score across multiple, valid tests."  Davis v. Astrue, No. 7:06-CV-00657, 2010 WL 2925357, at *5 (N.D.N.Y. July 21, 2010), and cases cited.  See also Fanning v. Bowen, 827 F.2d 631, 633 & n.2 (9th Cir. 1987) (claimant satisfied IQ prong of Listing 12.05(C) where IQ scores obtained during testing from one clinical psychologist ranged from 76 to 72, but IQ scores obtained during testing from a second clinical psychologist ranged from 71 to 69); Ray v. Chater, 934 F. Supp. 347, 350 (N.D. Cal. 1996) (inferring from language in the regulations expressing a preference for the lowest score obtained in a single test, "that when multiple I.Q. scores are available the Regulations prefer the lowest score").  The Social Security regulations specifically contemplate use of the Wechsler series of IQ tests, such as the one that was administered by Dr. Haas.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c) (explaining that "[t]he IQ scores in 12.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15; *e.g., the Wechsler series*" (emphasis added)).  Moreover, nothing in Dr. Haas' report suggests that his tests were invalid.  (See Tr. 478-82).

The Commissioner argues that it was reasonable for the ALJ to reject Dr. Haas'
results and adopt "the more recent full-scale IQ score obtained by Dr. Mascoop." (Def.
Mem. (Docket No. 30) at 14). This argument is not persuasive. "The regulations and case
law are clear that an ALJ may [only] reject the results of an IQ test which are shown to be
'invalid.'" Bard v. Astrue, No. 1:10-cv-220-JAW, 2011 WL 2559534, at *4 (D. Me. June
27, 2011) (unpub. op.) (quoting Velardo v. Astrue, Civil Action No. 07-1604, 2009 WL
229777, at *8 (W.D. Pa. Jan. 29, 2009)). While Dr. Mascoop stated that the results of the
WAIS-IV "are felt to *more* accurately reflect an individual's cognitive ability" within
each group of subtests than the WAIS-III that was used by Dr. Haas (see Tr. 589), neither
Dr. Mascoop nor Dr. Haas suggested that the WAIS-III was invalid or that it was
inappropriate to rely on the results of that test. See Black v. Astrue, 678 F. Supp. 2d
1250, 1259 (N.D. Fla. 2010) (finding no evidence "from which the ALJ might have
properly concluded that [IQ] scores were invalid" where "none of the experts conducting
the tests expressed any doubts about the validity of the scores"). Indeed, relevant case
law indicates that the WAIS-III has served as "the standard instrument in the United
States for assessing intellectual functioning." Atkins v. Virginia, 536 U.S. 304, 309 n.5,
122 S. Ct. 2242, 2245 n.5, 153 L. Ed. 2d 225 (2002). See also Maldonado v. Thaler, 625
F.3d 229, 236 (5th Cir. 2010) (describing WAIS-III as "the 'gold standard' for evaluating
intellectual functioning"); Peck v. Barnhart, 214 Fed. Appx. 730, 734 (10th Cir. 2006)
(finding that plaintiff met the IQ requirement for Listing 12.05(C) where WAIS-III
revealed a full scale IQ score of 70). Furthermore, the Commissioner's own regulations

pertaining to mental disorders expressly endorse the use of IQ tests, such as "the Wechsler series" of tests, "that have a mean of 100 and a standard deviation of 15." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c). According to Dr. Mascoop, both "[t]he WAIS-III and WAIS-IV Full Scale IQ ha[ve] a standard deviation of 15 points." (Tr. 589). Thus, even Dr. Mascoop recognized that "[s]ome range in scores is expected, statistically," and may have explained the inconsistency between the results of her testing and the results obtained by Dr. Haas. (Id.).

Even assuming, arguendo, that Dr. Haas' test results were invalid or otherwise unreliable, the plaintiff would still meet the IQ requirements of the listing for mental retardation. The Social Security regulations specifically provide that "[i]n cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(D)(6)(c). According to Dr. Mascoop's report of her testing, Lightfoot scored an 83 on the Verbal Comprehension Index, a 75 on the Perceptual Reasoning Index, a 74 on the Working Memory Index, and a 68 on the Processing Speed Index. (Tr. 585). Because his lowest score of 68 fell within the range of IQ scores set forth in Listing 12.05(C), the ALJ should have found that Lightfoot's results were sufficient to meet the IQ requirements for mental retardation no matter which set of tests she chose to credit.

For these reasons, the plaintiff has established that his IQ falls within the range needed to satisfy Listing 12.05.

## Work-Related Limitation of Function

The record is clear that Lightfoot meets the requirement of Listing 12.05 that he have a "physical or other mental impairment imposing an additional and significant work-related limitation of function." See Richardson, 2011 WL 3273140, at *6. An impairment satisfies this requirement "when its effect on a claimant's ability to perform basic work activities is more than slight or minimal." Nieves v. Sec'y of Health & Human Servs., 775 F.2d 12, 14 (1st Cir. 1985) (footnote omitted). Therefore, "[a] claimant satisfies the second half of the §12.05(C) test if he or she has a severe impairment" under 20 C.F.R. § 416.920(c). Id. at 14 n.7. In this case, the ALJ specifically found that Lightfoot's osteoarthritis, asthma and obesity constituted "severe" impairments for purposes of § 416.920(c). (Dec. Finding #2; Tr. 44). This is sufficient to meet the "significant work-related limitation of function" standard of Listing 12.05(C). See Nieves, 775 F.2d at 14 ("Because claimant's impairment was found to be severe, a fortiori it satisfies the significant limitations standard").

## The Adaptive Deficits Requirement

The Commissioner contends that even if the ALJ committed error with respect to the second two elements of Listing 12.05(C), "the plaintiff still cannot demonstrate that he satisfied the diagnostic description of mental retardation included in the introductory paragraph" of the Listing. (Def. Mem. at 15). As described above, that language requires the claimant to establish "[d]eficits in adaptive functioning initially manifested before age 22[.]" Richardson, 2011 WL 3273140, at *6. The Commissioner argues that Lightfoot's

ability to carry out various activities of daily living demonstrates that he does not have the necessary deficits in adaptive functioning required to satisfy Listing 12.05(C).  (Def. Mem. at 15-16).  For the reasons that follow, this court finds that this issue requires further consideration by the ALJ.

"'Adaptive functioning' is ordinarily associated with activities of daily living." Richardson, 2011 WL 3273140, at *7.  The regulations pertaining to the listings of mental disorders define "[a]ctivities of daily living" to include "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for . . . grooming and hygiene, using telephones and directories, and using a post office[,]" and specify that these activities are assessed on the basis of "their independence, effectiveness, and sustainability."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1).  "In addition to these examples, the Commissioner has indicated that the regulations would allow for consideration of 'any of the measurement methods recognized and endorsed by the professional organizations,'" that deal with mental retardation.  Richardson, 2011 WL 3273140, at *7 (quoting 67 Fed. Reg. at 20020)).  Thus, an ALJ may consult the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, the standard adopted by the American Association on Intellectual and Developmental Disabilities, "or the criteria of the other major professional organizations that deal with mental retardation" in order to determine whether a claimant has deficits in adaptive functioning.  Grunden v. Astrue, Civil Action No. 10-569, 2011 WL 4565502, at *4 (W.D. Pa. Sept. 29, 2011).

The ALJ's decision in the present case included no analysis of this element. (See Dec. 4-5; Tr. 45-46). Consequently, it is not clear whether the ALJ evaluated this issue at all. To the extent the ALJ did evaluate whether Lightfoot had deficits in adaptive functioning, it remains unclear "which measurement method the ALJ attempted to employ in [her] analysis, and whether [s]he fully considered the criteria of that method." Id. at *5. "[P]rinciples of administrative law require the ALJ to rationally articulate the grounds for her decision and confine [the court's] review to the reasons supplied by the ALJ." Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002). Because it is impossible to determine whether and to what extent the ALJ considered the first element of Listing 12.05(C), this court finds that a remand is required.

The Commissioner suggests that it is unnecessary to order a remand because the plaintiff has no prospect of showing deficits in adaptive functioning. (See Def. Mem. at 15-16). This court disagrees. While the ALJ found that Lightfoot was able to perform a variety of day-to-day activities, such as cleaning, making meals, socializing with friends, and taking public transportation (Dec. 5-6; Tr. 46-47), "Listing 12.05 does not require *significant* deficits in adaptive functioning; it only requires that there be 'deficits in adaptive functioning initially manifested during the developmental period; i.e., . . . before age 22.' 20 C.F.R., Part 404, Subpart P, Appendix 1 § 12.05." Black, 678 F. Supp. 2d at 1260 (quoting Cammon v. Astrue, Civil Action File No. 3:08-CV-0131-JFK, 2009 WL 3245458, at *11 (N.D. Ga. Oct. 5, 2009)). See also Richardson, 2011 WL 3273140, at *8 ("listing 12.05 does not require 'significant' deficits in adaptive functioning, only

-20-

deficits"). "The presence of certain, relative adaptive abilities does not rule out the presence of deficits in other areas of adaptive functioning." Richardson, 2011 WL 3273140, at *9. Moreover, the record in this case contains evidence indicating that Lightfoot's mental impairments preclude him from performing certain activities of daily living such as paying bills and handling certain financial matters, following written instructions, using a computer, and completing work in a timely manner, and that his physical impairments make it difficult for him to carry out activities such as shaving, climbing stairs, and doing laundry. ( Tr. 192, 196, 220, 222-23, 583). Therefore, the record is not as clear as the Commissioner contends, and this matter should be remanded to the Social Security Administration for consideration as to whether Lightfoot meets the adaptive functioning requirement of Listing 12.05.

### C.  Application of Listing 12.02 - Organic Brain Disorders

The plaintiff also challenges the ALJ's failure to consider whether Lightfoot meets Listing 12.02 for organic brain disorders. (Pl. Mem. at 15). Although the ALJ determined that "[t]here is nothing in the medical evidence of record establishing that any of the claimant's impairments is of listing level severity[,]" she did not expressly address Lightfoot's claim of disability under Listing 12.02. (See Dec. 4-5; Tr. 45-46). Lightfoot contends that this omission merits a remand for further administrative proceedings. (Pl. Mem. at 15-18). This court finds that no remand is warranted with respect to this issue.

The Circuit Courts of Appeal are divided on the question whether an ALJ's failure to address a claimant's assertion that his impairments meet the criteria of a listed impair-

ment at step three, in and of itself, requires a remand to the Social Security Administration.  See Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002).  The First Circuit appears not to have addressed this issue, and the courts in this district have yet to reach a consensus.  Compare Arsenault v. Astrue, 937 F. Supp. 2d 187, 189 (D. Mass. 2013) (finding that "ALJ's failure to specifically address Listing 1.02 was remandable error") with Rivera v. Barnhart, No. Civ. A. 04-30131-KPN, 2005 WL 670538, at *5 (D. Mass. Mar. 14, 2005) ("the failure – if failure it is – to make specific findings as to whether a claimant's impairment meets the requirements of a listed impairment is an insufficient reason in and of itself for setting aside an administrative finding").  Nevertheless, the First Circuit has held that "a remand is not essential if it will amount to no more than an empty exercise."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000).  Because this court concludes that other findings by the ALJ preclude the plaintiff's ability to prevail on his claim under Listing 12.02, Lightfoot has not shown that a remand would amount to anything more than an empty exercise.

### Requirements of Listing 12.02

There is no dispute that in order to be considered presumptively disabled under Listing 12.02, Lightfoot had to establish "both a significant loss in cognitive ability and evidence of *at least two* of the following manifestations: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration."  Stormo v. Barnhart, 377 F.3d

801, 808 (8th Cir. 2004) (emphasis added).  See also 20 C.F.R. Pt. 404, Subpt. P, App. 1,

§ 12.02(B).  Although the ALJ did not discuss Listing 12.02 in her written decision, she

specifically addressed this same criteria when she considered whether Lightfoot met the

requirements of Listing 12.05(D).  Specifically, in connection with her analysis of Listing

12.05, the ALJ discussed 12.05(D)[5] which, in addition to requiring an IQ of 60 through

70, requires

> at least two of the following: marked restriction of activities of daily
> living; marked difficulties in maintaining social functioning; marked
> difficulties in maintaining concentration, persistence, or pace; or
> repeated episodes of decompensation, each of extended duration.

(Dec. 4; Tr. 45).  These are the same "marked restrictions" as required for Listing 12.02.

The ALJ determined that Lightfoot had only "mild restriction" in his activities of

daily living, "mild difficulties" in social functioning, "moderate difficulties" with respect

to concentration, persistence or pace, and no episodes of decompensation that lasted for

an extended duration.  (Dec. 5; Tr. 46).  This court finds that there is substantial evidence

to support these findings.  Therefore, the plaintiff cannot prevail on his claim that his

mental impairments meet or medically equal Listing 12.02.

The plaintiff does not dispute the ALJ's determination that he had only mild

difficulties in social functioning, and no episodes of decompensation sufficient to meet

the requirements of a listed impairment.  (See Pl. Mem. at 17-18).  In addition, this court

---

[5] The claimant is not appealing the ALJ's determination that he does not meet the
requirements of Listing 12.05(D).

finds that substantial evidence supports her conclusion that Lightfoot had only mild limitations in his ability to carry out activities of daily living. As the ALJ stated in her written decision, Lightfoot "testified to fairly complete activities of daily living[.]" (Dec. 4; Tr. 45). Thus, during the administrative hearing, Lightfoot stated that while his wife is away at work during the day, he cleans the house, watches television, takes walks, reads, and makes his own meals. (Tr. 72-74). He also testified that he uses public transportation and socializes with friends and family members. (Tr. 67-69). Furthermore, during his psychiatric consultation with Dr. Haas, Lightfoot reported that he stays occupied during the day by reading books, watching television, and talking on the telephone, and that he performs household chores such as cooking and cleaning. (Tr. 480). This evidence supports the ALJ's finding of mild restriction in activities of daily living.

The opinion of J. Levinson, Ph.D., a State agency consultant, provides further support for the ALJ's conclusion that Lightfoot had only mild limitations on his ability to perform such activities. On June 15, 2010, Dr. Levinson completed a Psychiatric Review Technique form based on a review of the plaintiff's medical records. (Tr. 384-97). Therein, Dr. Levinson considered the impact of Lightfoot's impairments on his ability to carry out activities of daily living, and determined that Lightfoot had only mild limitations in that area of mental functioning. (Tr. 394). The ALJ considered Dr. Levinson's opinions in connection with her evaluation of Lightfoot's claim of disability. (See Dec. 7; Tr. 48). Accordingly, there is substantial support for the ALJ's determination that Lightfoot did not have "marked" restrictions in at least two areas of mental functioning.

The plaintiff contends that while he "can perform certain activities of daily living, he performs them only in a limited manner, and thus he still suffers a marked restriction." (Pl. Mem. at 17). This argument is not sufficient to undermine the ALJ's decision on this matter. A "marked" limitation may be found where "the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C). Lightfoot's own testimony and statements to Dr. Haas support the ALJ's conclusion that his limitations in this area were not so significant. Moreover, the ALJ considered the plaintiff's claim of limitations in his ability to carry out day-to-day activities, including his claims that he could only walk for 20 minutes, could lift only 5-10 pounds, could stand for no more than 30 minutes at a time, and had to lie down periodically. (Dec. 6; Tr. 47). However, she determined that Lightfoot's statements regarding the limiting effects of his impairments were not entirely credible. (Id.). As detailed below, the plaintiff has not established that there was any error in the ALJ's credibility analysis as it pertained to his physical limitations and ability to perform activities of daily living. Therefore, the record establishes that Lightfoot cannot satisfy the criteria of Listing 12.02, and there is no need for further consideration of that issue.

### D. <u>Rejection of Treating Physician Opinions</u>

As noted above, the ALJ found that Lightfoot retained the capacity to perform a limited range of light work. In so doing, she rejected some of the opinions of Gustavo

Velasquez, M.D.,[6] the plaintiff's treating physician. On June 8, 2011, Dr. Velasquez completed assessments of the plaintiff's ability to perform work-related activities in which he opined, inter alia, that Lightfoot could never crouch, stoop, kneel, or crawl, and that Lightfoot had a poor ability to understand, remember and carry out simple instructions, and was unable to concentrate for more than 1 to 2 hours during a typical 8-hour workday. (Tr. 578-81, 592-96). The plaintiff contends that the ALJ erred by failing to adopt these assessments. (See Pl. Mem. at 9-10, 12-14). While this court finds that the ALJ committed no error in connection with her decision to reject Dr. Velasquez's opinion regarding the plaintiff's postural limitations, her decision to reject his opinion regarding the plaintiff's mental limitations should be reevaluated upon remand.

## Postural Limitations

The plaintiff argues that the ALJ committed reversible error when she determined, in contrast to Dr. Velasquez, that Lightfoot retained the ability to occasionally crouch, stoop, kneel, or crawl. Specifically, the plaintiff contends that the ALJ's failure to credit Dr. Velasquez's opinion of Lightfoot's postural limitations was improper because she substituted her own views for the uncontroverted opinion of a treating physician, and relied on raw medical data to draw conclusions about the plaintiff's functional

---

[6] At times in her written decision, the ALJ omitted the "s" in Dr. Velasquez's last name. (See, e.g., Tr. 50). For purposes of consistency, this court has included the "s" throughout its decision, even when quoting the ALJ.

limitations.  (Pl. Mem. at 9-10).  This court disagrees, and finds that the ALJ's decision on this matter was appropriate.

As the ALJ explained in her decision:

> I accord the bulk of Dr. Velasquez's opinions in [his June 8, 2011 assessments] significant weight because he is a treating physician with a longstanding history of treating the claimant and his assessments are supported by objective clinical findings.  I note that Dr. Velasquez determined that the claimant could never crouch, stoop, kneel, or crawl.  However, I found that he could occasionally balance, stoop, kneel, crouch or crawl because there are no objective findings supporting that the claimant can never do these activities.  The claimant has had normal physical examinations, except for swelling in his left hand and crepitus in his right knee.  Moreover, the claimant's reported activities of daily living indicate that he can occasionally stoop, kneel, balance, crouch and crawl.  The claimant testified that he takes public transportation, he socializes with friends by watching sports together and having beers, he cleans the house, he watches television, he goes for walks and he makes his own meals.  The claimant's objective clinical findings upon physical examination and his activities of daily living support finding that the claimant can occasionally balance, stoop, kneel, crouch or crawl.

(Dec. 9; Tr. 50).  This conclusion is supported by the record.

"[S]ince bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record."  Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990).  Thus, as a general matter, "where an ALJ reaches conclusions about [a] claimant's physical exertional capacity without any assessment of residual functional capacity by a physician, the ALJ's conclusions are not supported by substantial evidence[.]"  Perez v. Sec'y of Health & Human Servs., 958 F.2d 445, 446 (1st Cir.

1991).  However, that is not the situation that occurred in the instant case.  As the ALJ

described in her written opinion, John Manuelian, M.D., a State agency physician,

reviewed the available medical evidence and completed an assessment of the plaintiff's

RFC on July 6, 2010.  (Dec. 7; Tr. 48; see also Tr. 405-12).  While Dr. Manuelian noted

that Lightfoot had osteoarthritis in his left hand and right knee, and walked with a right

sided limp, he opined that the plaintiff retained the ability to perform a wide range of

light work.  (See id.).  In particular, Dr. Manuelian found that the plaintiff remained

capable of balancing, stooping, kneeling, crouching and crawling occasionally.  (Tr. 407).


        Dr. Manuelian's findings are consistent with other medical evidence in the record.

For example, and as the ALJ noted, on July 20, 2009, Dr. Thakur performed a  physical

examination of the plaintiff.  (Dec. 6; Tr. 47, 469-71).  Although Dr. Thakur found

swelling of the metacarpophalangeal joints in Lightfoot's hands and some crepitus in his

knees, Dr. Thakur's findings were minimal.  (Tr. 470).  On January 13, 2010, Lightfoot

underwent another physical examination at Brigham & Women's Hospital in Boston.

(Tr. 328-29).  According to the report of the examination, Lightfoot's station and gait

were normal, and he displayed normal power, bulk, tone and sensation in his upper and

lower extremities.  (Tr. 328).

        Additional examinations of the plaintiff, which were described by the ALJ in her

decision, yielded similarly insignificant results.  For instance, the record shows that

David Cahan, M.D. examined the plaintiff on June 8, 2010.  (Tr. 379-81).  Although

Dr. Cahan reported finding crepitus in the plaintiff's left knee, he also determined that Lightfoot "could squat halfway down and rise from a squatting position," and was able to walk at a reasonable rate, albeit with a modest limp. (Tr. 380). Dr. Velasquez also conducted examinations of the plaintiff in January and March 2011, and reported no abnormal findings. (See Tr. 544-46, 601). Moreover, according to Dr. Velasquez, Lightfoot had a full range of motion in all of his joints. (Tr. 601).

"The law in this circuit does not require the ALJ to give greater weight to the opinions of treating physicians." Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004) (quoting Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991)). Thus, "'[c]ontolling weight' is typically afforded a treating physician's opinion on the nature and severity of an impairment where it . . . 'is well-supported by medically acceptable clinical laboratory diagnostic techniques and is not inconsistent with the other substantial evidence' in the claimant's case." Id. (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). Nevertheless, the ALJ is entitled to "downplay the weight afforded a treating physician's assessment of the nature and severity of an impairment where . . . it is internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians." Id. In light of the extensive contradictory evidence, including the evidence in Dr. Velasquez's own medical reports, there was ample basis for the ALJ to reject Dr. Velasquez's opinion.

**Mental Impairment**

While the ALJ's conclusion about Lightfoot's physical limitations are supported by the record, her rejection of Dr. Velasquez's opinion regarding his mental limitations is more problematic. As the ALJ found:

> I agree with Dr. Velasquez's findings [regarding Lightfoot's mental abilities], except for his determination that the claimant had a poor ability to understand, remember and carry out simple instructions and that he could concentrate for only 1-2 hours during a typical workday. The claimant's activities of daily living establish that he can concentrate for more than 1-2 hours during an 8 hour period and that he can understand, remember and carry out simple instructions. Dr. Velasquez did not provide any findings that substantiate such limitations and there is nothing in the medical evidence of record corroborating that the claimant has a poor ability to understand, remember and carry out simple instructions and that he can concentrate for only 1-2 hours during a typical workday. In fact, the remainder of the medical evidence of record indicates that the claimant can understand, remember and carry out simple instructions. For example, Dr. Haas, a consultative examiner, found that the claimant had a wide and appropriate range of affect, his memory was adequate and his attention and concentration were adequate. (Exhibit 25F)

(Dec. 9; Tr. 50). This court finds that the ALJ's reasoning is insufficient to withstand scrutiny.

The ALJ did not explain how Lightfoot's daily activities undermined Dr. Velasquez's opinion, and she did not describe any evidence, other than Dr. Haas' assessment that Lightfoot's memory, attention and concentration were "adequate," to support her characterization of the medical evidence. (Dec. 7; Tr. 48). As described above, IQ testing by Dr. Haas resulted in a performance IQ and full scale IQ which placed Lightfoot in the "mild range of mental retardation." (Tr. 481). Even if it was

appropriate for the ALJ to credit Dr. Haas' statements over the assessment of Lightfoot's treating physician, it is not apparent that Dr. Haas' report undermines Dr. Velasquez's assessment that Lightfoot had a poor ability to understand, remember and carry out simple instructions.

In any event, the ALJ's assertion that there is no evidence corroborating Dr. Velasquez's opinion is belied by Dr. Mascoop's psychological evaluation. Following her evaluation, Dr. Mascoop reported that Lightfoot's IQ scores were in "the Extremely Low range (2nd percentile) on combined measure of attention and concentration" and that he had "[s]ignificant weaknesses . . . in attention, concentration, motor speed and processing speed." (Tr. 586). She further stated that "[h]is cognitive ability based on his performance on the WAIS-IV was at the low end of the Borderline range[.]" (Tr. 587). The ALJ gave "significant weight" to Dr. Mascoop's test results and relied on them at step three of the sequential analysis. (See Dec. 3-4, 8; Tr. 44-45, 49). Because they lend support to Dr. Velasquez's assessment of Lightfoot's mental limitations, this court cannot find that the ALJ's rejection of that assessment was based on substantial evidence. Accordingly, the ALJ should revisit this issue upon remand.

### E.   Assessment of Lightfoot's Credibility

The plaintiff argues that the ALJ erred in assessing his credibility because she did not consider any evidence in connection with her analysis, beyond the objective findings set forth in the plaintiff's medical records. (Pl. Mem. at 11-12). However, this argument reflects an inaccurate reading of the ALJ's decision. The ALJ did conclude that "the

claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." (Dec. 6; Tr. 47). In so concluding, the ALJ expressly recognized her obligation to consider the entire case record in assessing the plaintiff's credibility. (<u>See id.</u>). In fact, as her decision illustrates, she specifically considered the plaintiff's testimony from the administrative hearing, including but not limited to, Lightfoot's statements regarding the nature and limiting effects of his symptoms and his ability to carry out activities of daily living. (<u>Id.</u>). She also considered complaints and other statements that Lightfoot made to the treating and examining physicians, as well as the opinions of various medical professionals who examined the plaintiff or conducted reviews of his medical records. (<u>See</u> Dec. 3-10; Tr. 44-51). In short, there is no support for the plaintiff's assertion that the ALJ did not consider the record as a whole or that her credibility assessment was not based on substantial evidence. Therefore, Lightfoot is not entitled to relief on this issue.

### F.     <u>Plaintiff's Request for a New ALJ</u>

Finally, the plaintiff requests that the court order the Commissioner to assign this matter to a new ALJ upon remand. (Pl. Mem. at 19-20). "The general rule appears to be that it is the Commissioner who has the discretion to assign a case to a new ALJ on remand." <u>Peck v. Colvin</u>, Civil Action No. 12-40146-DHH, 2014 WL 1056988, at *5 (D. Mass. Mar. 14, 2014) (slip op.) (quoting <u>Simpson v. Colvin</u>, No. 12-11435-RBC, 2014 U.S. Dist. LEXIS 30792, at *30, 2014 WL 904606 (D. Mass. Mar. 10, 2014)). Lightfoot

has not established that there is any reason to stray from the general rule in this case. Therefore, his request is denied.

In support of his request for an alternative ALJ, Lightfoot relies on the court's decision in Traynham v. Astrue, 925 F. Supp. 2d 149 (D. Mass. 2013). In that case, the court found that the record contained "overwhelming evidence of disability," and that the ALJ had "failed to give proper consideration and weight" to the opinions of all four of the plaintiff's treating physicians. Traynham, 925 F. Supp. 2d at 162. The court also found that the reasons given by the ALJ to "brush aside" those opinions "simply [could not] survive objective scrutiny." Id. Accordingly, the court determined that it was appropriate to remand the case to another ALJ. Id.

This court does not find that the facts of this case are comparable to the facts in Traynham. While the question of disability is for the Commissioner, and this court does not purport to express any views on the ultimate outcome of Lightfoot's claim, this court does not find that the evidence in favor of disability is so overwhelming, or that the ALJ's errors are so egregious, as to warrant the conclusion that her decision "cannot survive objective scrutiny." Furthermore, this court does not find any evidence, such as bias on the part of the ALJ, that would warrant the requested relief. See Peck, 2014 WL 1056988, at *5 (explaining that courts have ordered assignment to a new ALJ "where the record shows clearly that the ALJ is biased"). "To prove bias, a plaintiff must 'show that the ALJ's behavior, in the context of the whole case, was so extreme as to display clear inability to render fair judgment.'" Id. (quoting Rollins v. Massanari, 261 F. 3d 853, 858

(9th Cir. 2001)) (additional quotations and citation omitted). No such evidence has been presented here. Accordingly, this court finds that there is no reason to order that the case be assigned to an alternative ALJ upon remand.

## IV. CONCLUSION

For all the reasons detailed herein, the "Defendant's Motion to Affirm the Commissioner's Decision" (Docket No. 29) is DENIED, and the "Plaintiff's Motion for Order Reversing the Commissioner's Decision and Awarding Benefits" (Docket No. 21) is ALLOWED to the extent that it requests a remand to the Social Security Administration for further proceedings consistent with this decision. However, the plaintiff's request for a ruling that the proceedings be heard by a new ALJ upon remand is denied.

    / s / Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge